<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 97-2418     

                         UNITED STATES,

                           Appellee,

                               v.

                      PAUL GEORGE GAMACHE,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF NEW HAMPSHIRE

      [Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                     Stahl, Circuit Judge,

and Rosenn, Senior Circuit Judge.

                     _____________________

    Michael J. Sheehan, by appointment of the Court, for
appellant.
    Jean B. Weld, Assistant United States Attorney, with whom
Paul M. Gagnon, United States Attorney, and Arnold H. Huftalen,
Assistant United States Attorney, were on brief, for appellee.

                      ____________________

                        August 5, 1998
                      ____________________
         TORRUELLA, Chief Judge.  This appeal presents some
serious and disturbing issues which are both constitutional and
substantive in nature.  Appellant was charged and convicted in a
jury trial in which it was alleged that he traveled in interstate
commerce for the purpose of engaging in an illegal "sexual act"
with minors, in violation of 18 U.S.C.  2423(b), and that he
attempted to use a minor to engage in sexually explicit conduct for
the purpose of producing visual depictions of that conduct, in
violation of 18 U.S.C.  2251(a).  Upon his conviction, appellant
was sentenced to a term of imprisonment of 60 months.
         Five issues are raised on appeal, but because of our
disposition of this case, only two need be decided by us. These
are: (1) whether, as applied in this case, 18 U.S.C.  2423(b)
withstands a constitutional challenge based on the contention that
it attempts to punish "mere thoughts," and (2) whether the district
court committed reversible error by not giving any jury instruction
on the question of entrapment, notwithstanding appellant's request
for such an instruction.  We conclude that, as applied to the facts
of this case, the challenged statute punishes conduct, not "mere
thoughts" as is claimed, and thus that it passes constitutional
scrutiny.  However, we reverse appellant's conviction on both
counts because we are of the view that he was entitled to have the
jury instructed as to the defense of entrapment, and that the trial
court's failure to give the instruction substantially affected his
rights to a fair trial.

A.  The Background Facts
         In May 1995 a detective in the Keene, New Hampshire
Police Department, as part of a sting operation aimed at uncovering
child exploitation, placed a classified advertisement in the
personal section of the Tri-State Swingers magazine which read as
follows:
         FEMALE-TROY, NH; F.F.-female, 31; Single mom,
         two girls, one boy, seeks male as partner and
         mentor, seeks fun, enjoys travel and
         photography, FF P.O. Box 771, Troy, New
         Hampshire, 03465.

Approximately 104 responses were received by the detective, who in
turn answered the 97 individuals who sent addresses.  Among those
was appellant, then a 55-year old resident of Brunswick, Maine, who
was employed as a service worker with the Maine Yankee Nuclear
Power Plant.
         Because of the nature of the issues raised we are
required to reproduce in sordid detail the various epistolary
exchanges that ensued between appellant and the detective.
         This first response from appellant, which is postmarked
October 14, 1995, stated in its relevant parts:
         Your ad interested me.  Being your ad is in a
         swingers mag -- I will assume that you would
         be willing to swing.  With that, I'll describe
         myself . . . .  I enjoy hunting, fishing &
         camping. I am looking for someone to join me
         in the pursuit of happiness.  If you are that
         person, then maybe we should meet & discuss
         the situation.  I can travel or you could come
         here.  Please send photo & tell me about
         yourself.  If I interest you send phone # and
         I'll call you to set up a date.

The detective answered on October 18, 1995:
         I am assuming that you responded to my ad in
         part to be a mentor to my children and you are
         interested in family fun.  I am hoping that
         you think liberally about sex.  My family is
         very comfortable in front of the camera . . .  

At trial the detective testified that the use of the word "mentor"
in the advertisement was purposeful in order to draw out only
persons who were interested in "inter-generational sexual
interaction between adults and children."  Appellant testified,
however, that after looking the term "mentor" up in the dictionary,
he concluded that it meant "like role model," that "it was just
another gal looking for somebody to take care of her kids like they
do nowadays all over the country . . . [f]inancially, take them
fishing, hunting, whatever."
         Appellant next wrote the detective a lengthy letter,
postmarked October 23, 1995:
         I find no problem, being a mentor to your
         children & yes family fun does interest me.  I
         hunt, fish & go camping, in fact I just bought
         a camper yesterday & am getting it ready for
         next weekend.  My son & friend & I are going
         up north to deer hunt . . . . I also have a
         high speed bass boat -- I fish in tournaments,
         I am very outdoorsie.  Also do ice fishing.  I
         also have a camper on my truck, so whenever
         your ready to meet me, we could meet at a
         certain location & be comfortable.

         You say you hope I am liberal about sex, I am
         not exactly sure of what you are referring to
         in this area.  So I guess I'll tell you what I
         think about sex.  First off let me tell you,
         that I am an easy going person, I enjoy life
         to the fullest.  I am not a jealous person &
         do not like arguing or fighting.  I do not do
         drugs, only beer & my smokes.  Sex to me is
         very special.  Before I got married in the
         early 80's I had a girlfriend & we both were
         into the swinging scene.  We are/were both bi,
         it was one of the best periods of my life -- I
         met some real nice couples & we had many
         moments of pure enjoyment, in fact my swinging
         friends were better friends than my straight
         friends . . .

         The great part was not only did we enjoy the
         sexual part, but we also did other non sexual
         things together, cookouts, camping & saunas.  
         Yes F.F. I consider myself to be ultra liberal
         about sex . . . Oh yes, I forgot, I enjoy
         going to the nudist camp in your fine state --
         but at present being single -- they don't
         allow single males . . .

         Well F.F. I've told you about me -- now its
         your turn to tell me about you.  Some of my
         questions I have of you are:

         1.  What is it your looking for in life if it
         was with me?

         2.  What are your interests?

         3.  Are you a bisexual woman?

         4.  Tell me about your family. Oh yes -- you
         said your family is very comfortable in front
         of the camera -- what are you referring to?

         5.  Could you send a photo of yourself, nude
         preferred, but not required.  Also one of the
         family.

         6.  Do you use drugs, smoke or drink?

         7.  What kind of personality do you have?

         8.  What do you do for work?

         9.  Anything else that would be helpful in
         trying to get to know what you're like. For
         both our sakes, it will be much better to know
         all we can about each other and accept what
         is! . . . . Well F.F. I guess I've told you
         about me, I hope in the near future, to hear
         about you . . . .

         P.S.  I was looking at the map -- I think its
         about 3 hrs. drive to you.  Again your
         options:

         1.  You and your family can come here.

         2.  I can meet you at your place.

         3.  Anywhere in between.

         On November 1, 1995 the detective returned this
communication:
         I am glad you agree with the liberal
         upbringing of children, My 12-year-old son,
         and his 10 and 8-year-old sisters all practice
         nudism in our home.  They are very comfortable
         being naked in front of one another . . . What
         I am talking about when I speak of family fun
         is that all of my children freely involve
         themselves in sex training sessions. Some of
         these training sessions have been
         photographed.  The kids love to see themselves
         on video.  I am very interested in introducing
         an adult male to further my children's sexual
         education and experiences.  When I was a young
         girl my uncle was very kind to me and showed
         me the ways of love making. Let me know if you
         are interested . . . .

For the first time in this series of exchanges, the detective
answers as "Frances" instead of "F.F."  Appellant picks up on this
and other suggestions in his answer to this letter, which is also
postmarked November 1, 1995:
         You appear by your letters that you are trying
         to see if I am shocked by what you are telling
         me.  I can assure you, that I am not shocked,
         I really think you are a super person & will
         have less problems with your children than
         most straight, prudish couples have with their
         kids.  It sounds like your looking for another
         uncle like you had, to give your children the
         same experience as you had -- a loving, caring
         person.

         The way I look at all this -- as everyone is
         willing to learn about sex & is not forced,
         what harm is done? None as far as I am
         concerned . . . .

         You say you are very interested in introducing
         an adult man to further your children's sexual
         education & experiences. Frances I would be
         honored, if you choose me to be that adult
         man.

         Also Frances, as I told you, aside from the
         sex department -- I am looking for a family
         type life, camping, fishing, hunting, sharing
         the ups & downs of what life has to offer
         . . . .

         Could you send me a picture of you & the
         children? . . . I guess I am trying to get a
         mental picture of you & the children . . . .

         This thought just came into my mind -- you  
         said the children freely involved themselves
         in sex training sessions, do you have sex with
         them?  Have you introduced your son to orgasm?  
         What are your goals -- Teaching them straight
         sex, or bi-sex too? . . . . I want to have a
         better understanding of what you desire of me
         . . . .

         Approximately two weeks later, on November 14, 1995,
"Frances" wrote in return, again indicating that she wanted "to
expand [her] children's education and experience."  "She" also
indicated that "she" shared appellant's nude photograph with them,
and that they were "very excited about meeting" him. "Frances"
introduces her "children," "Steve," age 12, "Jenny," age 10, and
"Sarah," who is "just about to turn 8."  The letter went on to say
how she participated "during sex training with [her] children," and
proceeded to describe the nature of these activities, and what was
expected of appellant in this respect.  The subject of the "uncle"
was again raised, and "Frances" stated, "I hope my children can
gain the same type of experience through someone like you."  The
clincher comes at the end when "Frances" expresses her desire to
know appellant "for real. Maybe you have a video camera or have
access to one, let me know."
         Appellant's answer, postmarked November 20, 1995, is
addressed to "Frances, Steve, Jenny, & Sarah."  Appellant expresses
his understanding of "Frances'" request for secrecy, "as we all
know, it is against the law to be having sex with minors" . . . .
As to "Frances'" last suggestion, however, appellant states:
         No I don't have a videocamera or access to
         one, I don't know anything about them.  But
         when we get together, I'll take you out & you
         pick the one you like & I'll buy it.  I always
         thought about getting one -- but again I don't
         have a clue as to what make, model or anything
         about them.  You seem to have knowledge -- So
         it will be your job to pick one out . . . . I
         do understand when you say you want to weed
         out weirdos & people who would want to hurt
         your children . . . . I do not consider myself
         a pervert or a child molester . . . .

         You ask if I had any experiences & my feelings
         with young people.

         1.  I get along  very well with all my grand
         children, I've always been like a magnet with
         kids.  They seem to accept me very well.
         2.  No Frances I've never had an opportunity
         to experience family fun before.
         3.  The closest I came to having one was when
         I was around 11 or 12 . . . . [He recounts an
         experience with his stepmother] . . . .

         You asked if I am completely opposed to sexual
         touching with Steve?  Frances, . . . I am bi-
         sexual!  If Steve is interested & wants to
         learn the pleasures of bisexuality I'd be more
         than willing to touch, stimulate & have oral
         sex with him . . . .

         "Frances" next communicated with appellant on
November 28, 1995.  In this letter "she" again referred to the
"uncle [who] taught [her] about sex when [she] was very young, and
wanting "the same type of experience for [her] children."  
"Frances" also tells appellant that she is not interested in
finding a partner for herself "right now" as she is interested "in
introducing an adult to educate [her] children."  "She" indicates
that she has been involved with their sexual education:  
         The kids really enjoy being in front of our
         video camera.  I would suggest you send a
         video of yourself so the children can see
         . . .

         P.S. I would suggest you buy any of the new
         and smaller camcorders.  Any model will do.
         Let us know which one you pick out, they are
         all good.

         Appellant wrote back in a letter postmarked December 1,
1995.  He suggested that they meet for a "get acquainted" meeting
at  McDonald's or Dunkin' Donuts on his way back from a trip he was
making to Connecticut.  He wanted to know if in fact "Frances" was
a woman:
         I hope you understand this. Your ad in
         TriState you asked for a partner and mentor
         for your children, now in this last letter you
         say your not interested in finding yourself a
         partner, rather you are more interested in
         finding an adult male for the children to
         educate them, I guess you really want an adult
         sex toy for kids . . . .  I want you to know
         that I would be happy to be used as your toy
         for the further education of your children in
         the world of sex.  I've thought about you all
         daily & have even come up with what I think is
         a good idea for the 1st class that the
         children and I could have -- If your
         interested, tell me & in the next letter, I'll
         give you a graphic detail of what the class
         would consist of!

Appellant then asks "Frances" a series of questions about the
sexual experiences of the "children."  And finally:
         I am happy to hear you say you don't want to
         force me to do anything I don't feel
         comfortable with.  The only thing I don't feel
         comfortable with is the buying [of] a
         camcorder & sending a video.  As I already
         told you, I don't have a clue about them or
         how to operate them . . . .

         "Frances'" next letter is dated December 11, 1995.  "She"
encloses a photograph of "herself" and reiterates that "she" is
"mainly interested in finding some one who can sexually educate
["her"] children through having sex with them."  The letter then
states that:
         I realize that this is something not everyone
         can do or feel comfortable with.  Let me know
         if you feel all right with this.  Maybe if you
         send a letter directly to the kids telling
         them about sex and what you hope to do with
         them when we all meet would be good.

"She" then goes on to describe the "children's" sex experiences up
to then, and that he should decide what he should do.
         Appellant next sent "all of you" a Christmas card post
marked December 18, 1995 in which he stated that he wished he
"could have been your Christmas present laying under the tree.
Maybe next year."
         On that same date appellant also wrote a lengthy letter
directed to "Frances," which responds to "her's" of the 11th:
         I do want to thank you for the picture. You
         are a very attractive lady, along with having
         very sensual eyes, I envy your uncle that you
         told me about -- He was a very lucky man. My
         hope is someday I may be as lucky.  Yes my
         dear, I know -- you're not interested in me --
         but rather for the kids. I was just letting
         you know how I feel.

Appellant then goes on to explain, at length and in detail, how he
will carry about the sexual "education" of "Frances'" "children".  
He ends by telling "her" that "[t]he next letter will be for the
kids -- let them open it so it can be kind of personal for them."
         True to his word appellant next writes "Steve, Jenny, and
Sarah" in a letter postmarked December 19, 1995, in which no words
are spared describing the sexual activities that will take place
when "they" "begin having classes in the very near future -- before
they get married -- Ha, Ha." (underlining in the original).  
Appellant ends the letter by asking "them" for a photograph, which
"[does not] have to be nude unless you'd like to."
         "Frances" responded on December 22, 1995:
         The kids really liked your letter and had a
         lot of questions about when we will all get
         together and the things you wrote about . . .
         If you are still willing we would love to have
         you come and meet with us . . . A motel would
         be nice.  I would like to meet in Keene, New
         Hampshire.  I will leave the planning up to
         you.  The kids told me that they would love to
         have oral sex with you the first time and any
         pictures or videos that are taken will be
         given to you as a gift.

         On December 28, 1995, appellant answered "Frances, Steve,
Jenny, & Sarah" to the effect that "[t]he fact that you all want to
meet with me, make love & a beautiful film is more than I could
ever hope for.  I promise I will do all in my power to make you all
happy, both in the sexual department & also in normal life
activities, if you will let me."  He goes on to state that "this
will be a new experience for me as well."  The rest of the letter
deals mainly with the arrangements for the meeting, which appellant
suggests take place at the Troy (N.H.) Post Office.  He proposes
that, from there, all of them travel to Keene.  Appellant ends by
asking for a "regular picture of the kids to put on [his] dresser"
next to "Frances'."
         "Frances" answered on January 3, 1996, indicating that
the "kids" were "very excited about your being involved in their
sexual sessions and your bringing a video camera to make a film.
Since it will be our first time you may keep the film."  "She" was
not agreeable to the Troy suggestion, however, and insisted on a
motel in Keene.  As to the request for the "children's" photo,
"she" also rejected the request and told appellant that he was
"free to take as many pictures as you want when we meet."
         Appellant's final letter is postmarked January 3, 1995,
and again it is addressed to "Frances, Steve, Jenny & Sarah."  The
final plans for the meeting are proposed, with the date of
January 20th and the "Super 8 Motel" in Keene being suggested as
the time and place to meet.  Appellant draws a map with directions
as to how to get there and indicates that he will sit in his truck
in the parking area until "they" come along side him.  Then he will
get out and approach "them."  He includes a photograph of his truck
so "they" will recognize it.
         In the last of this distasteful correspondence, dated
January 16, 1996, "Frances" tells appellant that everything is on
course for the meeting but that "our video camera is broken so I
will leave the video or pictures (your choice) up to you."
         The line and bait cast, all that remained was the setting
of the hook.
         On the appointed date, appellant drove from his home in
Maine to Keene, New Hampshire, arriving at about 1:00 p.m. at the
parking lot of the Super 8 Motel in that town, where he parked his
truck awaiting the arrival of "Frances" and the "kids."  Observing
his arrival, however, was the Keene detective who had commenced the
events that eventually led to this encounter.  Upon matching
appellant's vehicle with the Polaroid photo that Gamache had sent
"Frances" on January 3, which showed a pickup truck with a camper,
the detective and other accompanying police officers approached
appellant, who had remained seated in the vehicle, and proceeded to
arrest him and to execute an anticipatory search warrant that had
been issued against appellant and his vehicle.
         Inside the cab were found bags of snacks and candy,
several two-liter bottles of soda, a bottle of wine, eleven
styrofoam cups, a jar of mixed nuts, a vibrator, a Polaroid camera
loaded with film, ten extra cartridges of film, nine condoms, a
lubricating jelly tube, a partially used tube of jelly, and a
number of items conflictingly described as "small condoms" by the
detective and as "finger cots" by appellant, who testified at trial
that they are used to protect injured fingers.  Several of these
latter items were also found in appellant's pockets, within a
plastic bag which also contained jelly and adult condoms.
         While this incident was developing, the Brunswick, Maine
police were executing a search warrant of appellant's home, where
they found a road map with the town of Keene circled, "Frances'"
letters to appellant, and a note on a marker board in the kitchen,
written by appellant's roommate, telling him not to forget his
camera.  However, they found no evidence that appellant was
interested in, or had a history of, the exploitation of children or
child pornography.
B.  The Constitutional Challenge to 18 U.S.C.  2423(b)
         Section 2423(b) provides that:
         A person who travels in interstate commerce,
         or conspires to do so . . . for the purpose of
         engaging in any sexual act (as defined in
          2246) with a person under 18 years of age
         that would be violation of chapter 109A if the
         sexual act occurred in the special maritime
         and territorial jurisdiction of the United
         States shall be fined under this title,
         imprisoned not more than 10 years, or both.

         Count I of the indictment, which deals with this
provision, charges appellant with having traveled in interstate
commerce from Maine to New Hampshire for the purpose of engaging in
an illegal sexual act with a person under the age of 18.  It is not
at issue that the acts in question are within the definition of
illegal "sexual act[s]" as defined in 18 U.S.C.  2246(2).
         On the one hand, appellant alleges the invalidity of this
statute because according to him, it criminalizes "mere thought,"  
yet, on the other hand, he claims that it is "unconstitutional in
that it criminalizes one who crosses a state border with a sinister
intent, without needing to prove any other act."  These really are
different and somewhat inconsistent arguments, which we address
separately, but which in any event are unavailing to appellant.
         Whether it is constitutionally permissible to criminally
punish "mere thought" may pose an interesting subject for academic
discourse, see Steffan v. Perry, 41 F.3d 677, 713-14 (D.C. Cir.
1994); LaFave & Scott, Criminal Law  25, at 177-79 (1976), but, as
can be seen from our recitation of the practically undisputed facts
in this appeal, that is not the way this statute is being applied
to appellant.  Appellant did not abstractly contemplate crossing
state boundaries with a thought to committing a crime upon reaching
his destination.  Appellant did not merely sit in the quiet of his
house, contemplate evil thoughts, and then flip the channels of his
television set, and continue blithely with other musings.  
Appellant is not charged, nor does this statute, as applied, punish
mere voyeurism.
         As the record clearly establishes, appellant, at a
minimum, engaged in a series of acts long past the "mere thinking"
stage.  See United States v. Price, 134 F.3d 340, 351 (6th Cir.
1998) ("[B]ecause of the . . . danger of convicting for mere
'thoughts' . . . we require that the 'substantial step' consist of
'objective acts.'").  This series of acts includes the interchange
of extensive correspondence that eventually led to the actual trip
and that shows that at some point he became an active participant
in the planning of this trip; the purchasing of supplies, and their
transportation in his vehicle (supplies which, it could be argued,
were designed to be used to carry out his allegedly nefarious
purposes); and his actual traveling to the subject place, on the
subject date, at least arguably (if you interpret the evidence in
favor of the Government, see United States v. Loder, 23 F.3d 586,
589 (1st Cir. 1994)), ready, willing and able to carry out his
"educational" mission.  Given these circumstances, it can hardly be
claimed that punishment for "mere thought" is at issue.
          The variation of this "thought crime" theme to the
effect that the statute is unconstitutional because "it
criminalizes one who crosses a state border with sinister intent,
without the need to prove any other act" (emphasis supplied)
demonstrates an inconsistency with the argument that "mere thought"
is being punished.  The "other" act language concedes that at least
one act took place, i.e., crossing a state line, which is something
more than "mere thought".  An alternate interpretation of this
claim presupposes that Congress cannot criminalize a single act.  
This is a novel theory for which we can find no support.  One
clearly defined act is sufficient.  In this case, the act is
"traveling in interstate commerce," a phrase which  supplies not
only the jurisdictional basis for the federalization of the
proscribed conduct, but also the "objective act" that facilitates
the proof of the intent, together with the other evidence
introduced.  See Hoke v. United States, 227 U.S. 308, 323 (1923)
(similar language in the Mann Act constitutional); United States v.Vang, 128 F.3d 1065, 1073 (7th Cir. 1997), cert. denied, 118 S. Ct.
1107 (1998) ( 2423(b) constitutional); United States v. Delpit, 94
F.3d 1134, 1149 (8th Cir. 1996) (similar language in the Murder-
for-Hire Statute upheld); Price, 134 F.3d at 351.  On this last
point, of course, just crossing the state border is not enough: the
Government must also prove that the crossing was made with the
intent to engage in the proscribed conduct.   
         Proof of intent naturally means proving state of mind,
but that does not mean that one is punishing "mere thought" any
more than that the requirement of proving mens rea in most crimes
means that one is solely punishing "mere thought."  Now,
undoubtedly, establishing intent, short of a situation in which it
is admitted, is difficult and usually depends on the use of
circumstantial evidence.  See id.  But as we all know,
circumstantial evidence, if it meets all the other criteria of
admissibility,  is just as appropriate as direct evidence and is
entitled to be given whatever weight the jury deems it should be
given under the circumstances within which it unfolds.  In any
event, difficulty of proof is not a valid criteria for determining
the constitutionality of the present statute.
         Appellant's challenge in this respect is not well taken
and is rejected.
C.  The Entrapment Issue
         Appellant fares better on his entrapment argument.
         A properly preserved request for an entrapment
instruction will be reviewed plenarily on appeal.  See United
States v. Rodrguez, 858 F.2d 809, 812 (1st Cir. 1988).
    A criminal defendant is entitled to an instruction on his
theory of defense so long as the theory is a valid one and there is
evidence in the record to support it.  See id.  In making this
determination, the district court is not allowed to weigh the
evidence, make credibility determinations, or resolve conflicts in
the proof.  Rather, the court's function is to examine the evidence
on the record and to draw those inferences as can reasonably be
drawn therefrom, determining whether the proof, taken in the light
most favorable to the defense can plausibly support the theory of
the defense.  See id.; see also United States v. Montaez, 105 F.3d
36, 39 (1st Cir. 1997).  This is not a very high standard to meet,
for in its present context, to be "plausible" is to be
"superficially reasonable."  See Webster's Third New International
Dictionary, at 1736 (1971).
    Entrapment occurs "when the criminal design originates
with the officials of the government, and they implant in the mind
of an innocent person the disposition to commit the alleged offense
and induce its commission in order that they may prosecute."   
Sorrells v. United States, 287 U.S. 435, 442 (1932).  This defense
has two elements:  (1) improper Government inducement of the crime,
and (2) lack of predisposition on the part of the defendant to
engage in the criminal conduct.  See Montaez, 105 F.3d at 38;
United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994).  The
defendant carries the initial burden of producing some evidence of
both the Government's improper inducement, and the defendant's lack
of predisposition to commit the alleged offense, so as to "raise a
reasonable doubt as to whether he 'was an unwavering innocent'
rather than an 'unwavering criminal.'"  United States v. Joost, 92
F.3d 7, 12 (1st Cir. 1996).
    "Inducement" exists when the governmental deception or
instigation actually implants the criminal design in the
defendant's mind.  See United States v. Russell, 411 U.S. 423, 436
(1973).  Inducement may include persuasion, false statements, or
other governmental conduct that creates a risk of causing an
otherwise unwilling person to commit the crime charged.  SeeGendron, 18 F.3d at 961-62.
    A "sting" operation is not improper inducement if it
merely provides an opportunity to commit a crime, but proof of
opportunity plus "something else" may be adequate to meet a
defendant's burden.  See Joost, 92 F.3d at 12.  Examples found
sufficient by courts include threats, forceful solicitation and
dogged insistence, and repeated suggestions.  See id.
    Once the defendant makes a showing of inducement and lack
of predisposition, the Government must prove defendant's
predisposition to engage in the charged criminal activity, beyond
a reasonable doubt.  See United States v. Walker, 344 F.2d 795, 796
(1st Cir. 1965).  Factors to be considered by the court in
assessing whether the defendant was predisposed to commit the crime
charged are:  (1) the character or reputation of the defendant; (2)
whether the initial suggestion of criminal activity was made by the
Government; (3) whether the defendant was engaged in the criminal
activity for profit; (4) whether the defendant showed reluctance to
commit the offense, which was overcome by the governmental
persuasion; and (5) the nature of the inducement or persuasion
offered by the Government.  See United States v. Busby, 780 F.2d
804, 807 (9th Cir. 1986).
    Two recent decisions -- one from the Supreme Court and
the other from this Circuit -- have delineated more precisely the
contours of the entrapment defense.  In United States v. Jacobson,
503 U.S. 540 (1992), the Supreme Court held that Jacobson had been
entrapped as a matter of law when government agents engaged in a
campaign of phony mailings, which involved seven or eight mailings
spanning a 26-month period, that induced him to violate the federal
ban on child pornography by purchasing two illegal pornographic
magazines.  After reviewing the Government's persistent
encouragements, which included letters from fictional lobbying
organizations that claimed to promote sexual freedoms, the Supreme
Court found that Jacobson's "ready response to these solicitations
cannot be enough to establish beyond a reasonable doubt that he was
predisposed, prior to the Government acts intended to create
predisposition, to commit the crime."  Id. at 553.
    In United States v. Gendron, 18 F.3d 955 (1st Cir. 1994),
then Chief Judge (now Justice) Breyer provided our "most useful
discussion" of the entrapment defense post-Jacobson.  United Statesv. Acosta, 67 F.3d 334, 337 (1st Cir. 1995).  We explained that the
Government "sting" in Jacobson did more than simply offer an
"ordinary opportunity" to buy child pornography.   Rather, that
sting combined an ordinary opportunity with certain "extra
elements" so that there was a "risk of catching in the law
enforcement net not only those who might well have committed the
crime elsewhere (in the absence of the sting), but also those who
(in its absence) likely would never have done so."  Gendron, 18
F.3d at 961.  We then identified three such "extra elements."   
First, the Government's operation "reflected a psychologically
'graduated' set of responses to Jacobson's own noncriminal
responses, beginning with innocent lures and progressing to frank
offers."  Id. at 962.  Second, the Government's solicitations
appealed to alternative motives (i.e., anti-censorship motives),
see id., which suggested that the illicit conduct was "something
the [defendant] ought to be allowed to do," Jacobson, 503 U.S. at
553.   Third, the Government's efforts stretched out over two
years.  Id.
    Without unduly repeating the details of this depressing
record, we survey the relevant evidence.  It is undisputed that the
Government initiated this victimless incident with its
advertisement.  Thereafter, a stream of correspondence followed
even after it became apparent, from the initial letters, that
appellant was on a different wavelength than the detective.  
Appellant was interested in having sex with the adult "Frances."  
His initial response was directed to "F.F."/"Frances," not her
"children."  What each understood "mentor" and "family fun" to
mean, at least at the beginning, was very different, and this can
be garnered not only from reading the correspondence, but also from
both the detective's and appellant's testimony at trial.  Appellant
ultimately became ensnared by the detective's artifice.  The record
is clear that it was the Government's insistence and artful
manipulation of appellant that finally drew him into the web
skillfully spun by the detective.  To this we must add that it was
appellant's contention, and he so testified, that all of his
correspondence about sex with minors was a ruse to have sex with
"Frances," who was his target from the time that he answered the
ad.  Although this version is obviously disputed by the Government,
that is irrelevant to the question of whether it raises an issue of
entrapment to be put before the jury.  
    Furthermore, appellant had no criminal record,
particularly as to the child molestation, exploitation, or any
related matter.  In fact, on the stand, the detective testified
that appellant did not even fit a pedophile profile and that there
was no evidence that linked him to prior sexual activities with
children.  It was the Government that first mentioned the
"children" as sex objects; it was the Government that first used
sexually explicit language involving the "children"; it was the
Government that escalated the subject of sex with children; and it
was the Government that first brought up the use of photographic
equipment.   
    As to the latter, the entrapment issue becomes even more
apparent with respect to the allegations of attempted manufacture
of child pornography. Appellant's response to "Frances'" suggestion
of using a camera reveals how far photography was from his
cerebrations or fantasies when he wrote: "No, I don't have any
videocamera or access to one, I don't know anything about them."  
The record is redundant with the Government's relentless
reiteration of the subject to a person that was patently ignorant
of this activity, even to the very last moment.
    Turning first to "inducement," we think that, in light of
our analysis in Gendron, the evidence of improper inducement here
was sufficient to submit the question to the jury.  First, Gamache
initially expressed only his desire for a sexual relationship with
Frances and his intent to form a non-sexual relationship with her
children.  In addition, the agent here manufactured the aura of a
personal relationship between Gamache and the fictional "Frances,"
and "Frances" disclosed her fictional illicit intentions only well
into the correspondence.  These solicitations are quite similar to
the type of "psychologically graduated" responses that the JacobsonCourt found objectionable.  Second, the government agent provided
justifications for the illicit activity (intergenerational sex) by
describing "herself" as glad that Gamache was "liberal" like her,
expressing that she, as the mother of the children, strongly
approved of the illegal activity, and explaining that she had
engaged in this conduct as a child and found it beneficial to her.  
These solicitations suggested that Gamache ought to be allowed to
engage in the illicit activity, just as the Government in Jacobsonused a fake lobbying organization to appeal to anti-censorship
motives.  Finally, the Government's sting commenced in May 1995 and
did not result in any illegal conduct until January 1996.  Thus,
the Government persevered for almost seven months to elicit the
offense conduct.  In Gendron, we observed that, in Jacobson, the
Government had conceded that its methods amounted to an "improper
inducement" as a matter of law.  Gendron, 18 F.3d at 963 (citing
Jacobson, 503 U.S. at 549 n.2).  We think that these "extra
elements" are sufficient to satisfy the defendant's burden on the
inducement prong.  See id. at 961.  
    Turning to the predisposition prong, under the analysis
set forth in Jacobson, a reasonable jury could find that Gamache
was not predisposed to commit the offense. "[P]roof that [the
defendant] engaged in legal conduct and possessed certain
generalized personal inclinations is not sufficient evidence to
prove beyond a reasonable doubt that he would have been predisposed
to commit the crime charged independent of the Government's
coaxing."  Jacobson, 503 U.S. at 551 n.3.  As we explained in
Gendron:
         The evidence of predisposition [in
         Jacobson] consisted of two facts: (1) that
         before the government became involved
         Jacobson was on a private bookstore
         mailing list for dubious photos; and (2)
         that he responded affirmatively to the
         government's solicitations.  The first
         fact . . . showed little about a
         predisposition to act unlawfully because
         ordering the photos was lawful at the
         time. . . .  The second, placing orders,
         could not show how Jacobson would have
         acted had the solicitation lacked . . .
         the improper appeals to anti-censorship
         motives, the graduated response, and the
         lengthy time frame.  [As a result,] the
         government's evidence did not show how
         Jacobson would have acted had he been
         faced with an ordinary "opportunity" to
         commit the crime rather than a special
         "inducement."  
Gendron, 18 F.3d at 963.  As in Jacobson, Gamache initially
expressed an interest in unusual sexual activities, but these
activities were not illegal with Frances.  Nor is the inference
permissible that the tendency to engage in unusual, albeit legal,
sexual activity with an adult indicates a predisposition towards
pedophilia.
    The Government responds that Gamache's enthusiastic
response, as expressed in the correspondence, in conjunction with
the lack of coercion and/or affirmative pressure by the Government
agent, is enough to take the entrapment defense away from the jury.  
We disagree.  Gamache's stated willingness to commit the crime,
although clearly relevant to the jury's inquiry, is not sufficient
by itself to mandate a finding that he was predisposed.   As Judge
Posner explained:  
         Had the Court in Jacobson believed that
         the legal concept of predisposition is
         exhausted in the demonstrated willingness
         of the defendant to commit the crime
         without threats or promises by the
         government, then Jacobson was predisposed,
         in which event the Court's reversal of his
         conviction would be difficult to explain.  
         The government did not offer Jacobson any
         inducements to buy pornographic magazines
         or threaten him with harm if he failed to
         buy them.  It was not as if the government
         had had to badger Jacobson for 26 months
         in order to overcome his resistance to
         committing a crime.  He never resisted.
United States v.  Hollingsworth, 27 F.2d 1196, 1199 (7th Cir.
1994).     
    Furthermore, as we have noted, there was no evidence
presented that Gamache had engaged in similar activities
independent of this sting operation.   The jury could have relied
on this evidence to find a lack of predisposition because the
concept of predisposition has a definite temporal reference: "the
inquiry must focus on a defendant's predisposition before contact
with government officers or agents."  United States v. Brown, 43
F.3d 618, 627 (11th Cir. 1995) (citing Jacobson, 503 U.S. at 547
n.2); see also United States v. Gifford, 17 F.3d 462, 469 (1st Cir.
1994) (identifying as "critical" the time "in advance of the
government's initial intervention").  All of the Government's
circumstantial evidence bearing on Gamache's intent when he crossed
the state line resulted from the Government's initial contact.  The
argument is clear in regard to his conviction for attempting to use
a minor to engage in sexually explicit conduct for the purpose of
producing visual depictions.  Despite the Government's dogged
insistence that Gamache bring a video camera, Gamache professed
ignorance about such cameras and resisted purchasing one.  There is
no evidence independent of Gamache's correspondence with the
government agents -- other than perhaps "small condoms" found on
the defendant (which the defendant testified were "finger cots"
that protected injuries to his fingers) -- that indicated a
predisposition to engage in illegal sexual contact with minors
prior to, and apart from, the correspondence.  And while "ready
commission of the criminal act can itself adequately evince an
individual's predisposition" and thus provide sufficient evidence
to support a jury's finding that the defendant was predisposed to
commit the offense, Gifford, 17 F.3d at 469, eagerness alone, when
coupled with the "extra elements" present in this sting operation,
is not sufficient to remove the predisposition question from the
jury's purview.   
    We conclude that appellant met the dual burdens required
for an instruction on entrapment, because the evidence raises a
reasonable doubt that the Government improperly induced a citizen
to commit crimes that he was not predisposed to commit, yet crimes
for which he was charged and convicted. "[E]ven where there are no
credibility issues or tensions in the evidence -- and some do exist
here -- entrapment is treated as an issue of fact for a jury."  
Acosta, 67 F.3d at 338.  Although it is not dispositive of the
issues before us, we take note of the fact that in sentencing
appellant the district judge granted a downward departure from the
Guidelines, based on his conclusion that appellant had engaged in
"aberrant behavior," a conclusion that would seems to include some
element of lack of predisposition.
    The district court committed reversible error in not
giving an instruction on the issue of entrapment.  Appellant's
conviction is reversed and a new trial is ordered.

</body>

</html>